John D. WALLACE, Orzell Billingsley, Jr., Jimmy Holmes, Joe Sledge, and John Henry Davis, for themselves and jointly and severally for all others similarly situated, Plaintiffs,

v.

Albert BREWER, as Governor of Alabama and his successors, et al., Defendants.

Civ. A. No. 2988-N.

United States District Court, M. D. Alabama, N. D.

June 9, 1970.

Charles Morgan, Jr., and Reber F. Boult, Jr., Atlanta, Ga., Jack Drake, Tuscaloosa, Ala., Jim Keenan, New Orleans, La., and George W. Dean, Destin, Fla., for plaintiffs.

MacDonald Gallion, Atty. Gen., of Ala., and Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., for defendant officials of the State of Alabama and the Legislative Commission to Preserve the Peace, its director and members.

Hugh A. Locke, Jr., Locke & Locke, Birmingham, Ala., for all other defendants—"RID" and its leaders, Pine Forest Missionary Baptist Church and its trustees.

Before RIVES, Circuit Judge, and GROOMS and JOHNSON, District Judges.

## OPINION

PER CURIAM:

Plaintiffs Wallace, Billingsley, Holmes, Sledge and Davis brought this action seeking injunctive relief against defendants. Specifically, plaintiffs request a temporary restraining order and preliminary injunction enjoining defendants: (1) from enforcing certain Alabama statutes under which plaintiffs have been arrested;[1] (2) from conduct harassing, threatening, and interfering with plaintiffs in exercising their first amendment rights to express themselves and associate and to exercise their chosen religion, and their statutory rights to hold and own property and to make contracts; (3) from proceeding with civil litigation in state courts for trespass; (4) from proceeding or acting in any manner pursuant to terms and conditions of Alabama House Joint Resolution No. 5 and the Alabama Legislative Commission to Preserve the Peace. Plaintiffs have also requested this Court to declare (1) that the practice, policy, custom or usage of defendants is in violation of the laws and Constitution of the United States;[2] (2) that Alabama statutes under which plaintiffs have been arrested, see note 1, *supra*, are unconstitutional; (3) that Alabama House Joint Resolution No. 5 is unconstitutional.

Plaintiffs premise their request for declaratory and injunctive relief upon the first, fifth, sixth, eighth, ninth, thirteenth, fourteenth and fifteenth amendments to the U.S. Constitution and also upon 42 U.S.C. §§ 1981, 1982, 1983, 1985 and 1988.

On December 11, 1969, this Court concluded that a temporary restraining order was necessary to prevent irreparable damage and, therefore, temporarily enjoined defendants Waid and Gallion from prosecuting plaintiff Holmes for violating Title 14, § 97(4a) (under arrest warrant issued on November 11, 1969) and Title 14, § 426 (under arrest warrant issued on November 11, 1969), and plaintiff Billingsley under a warrant charging him with acting as agent for a corporation without a license authorizing it to do business in Alabama. On December 16, 1969, these defendants were also temporarily enjoined from prosecuting plaintiff Davis for violating Title 10, § 21(94) (under arrest warrant issued on December 4, 1969). On January 28, 1970, from the bench, this Court further enjoined these defendants from prosecuting plaintiff Holmes under a warrant (issued on January 7, 1970) charging

---

1. Code of Alabama, Title 10, §§ 21(93), 21(94); Title 14, §§ 97(1)–(8); Title 14, § 426; Title 3, § 95.

2. 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1988; Amendments to U.S. Constitution 1, 5, 6, 8, 9, 13, 14, 15.

him with permitting livestock to run at large.

Various motions were made by both plaintiffs and defendants and several were continued pending the hearing on plaintiffs' motion for preliminary injunction and the decision of this Court: (1) defendants' motion to dissolve temporary restraining order; (2) defendants' motion to dismiss; (3) defendants' motion for summary judgment; (4) defendants' motion to bring in third-party defendants. An evidentiary hearing on these motions and on plaintiffs' motion for preliminary injunction was held on January 28, 1970.

A brief summary of the facts follows. The Black Muslims made their first purchase of land in St. Clair County in July 1969 under the name Progressive Land Developers, Inc. (PLD). The 376-acre farm in north St. Clair County was purchased for $115,105 from Ray Wyatt, a resident of St. Clair County. In May 1969, Wyatt and Robert McClung bought a 541-acre farm, Big Beaver Ranch, in the southern part of St. Clair County, at public auction and then resold the farm to PLD for $80,646.11. The Big Beaver Ranch was adjacent to the Pine Forest Missionary Baptist Church and surrounded the church cemetery.

Early in November the citizens of St. Clair County became aware of the purchases of land by the Black Muslims. After it became apparent that the Black Muslims were planning to operate two farms in St. Clair County, a series of activities, both legal and extralegal, were instituted to prevent the establishment of these farms. On November 11 defendant John Golden, under the claim of a lease with option to purchase the 376-acre farm in north St. Clair County, swore to a warrant for the arrest of plaintiff Holmes on a charge of trespass after warning in violation of Title 14, § 426, Code of Alabama. On the same day a warrant charging Holmes with "Failure to Register as a Muslim" in violation of Title 14, § 97(4a), was sworn to by defendant Bishop.

On November 19, 1969, a warrant was sworn to by defendant Bishop and issued for the arrest of plaintiff Billingsley, a Negro attorney. The warrant, without specifying the statute that he had allegedly violated, charged Billingsley with acting as an agent for "a foreign corporation which was without a license authorizing it to do business in the State." The specific act was the filing of a deed, which conveyed land to PLD, with the Judge of Probate in Pell City, Alabama.

The next day defendant Waid, District Attorney for the 30th Judicial Circuit of Alabama, which includes St. Clair County, filed four complaints against PLD for failure to register as a foreign corporation. These complaints are not directly attacked in this action.

On November 21, 1969, defendants Wyatt, Bishop and Golden organized and conducted a meeting attended by approximately 2000 residents of St. Clair County. The meeting organized for the purpose of rallying public support for a "Stop the Muslims" movement was attended by defendant Strickland who spoke on behalf of the Alabama Legislative Commission to Preserve the Peace. Strickland warned that the Muslims "don't respect our flag and they support communist positions in many ways while they regard Christianity as the enemy," noted that violence initiated by whites could be a natural outgrowth of attempts by "black people" to buy land in St. Clair County, and stated that Attorney General Gallion intended to aid the white citizens of St. Clair County.

Defendant Gallion issued a statement (1) warning that "the so-called farms can easily be used for storage of weapons and training in guerrilla warfare," (2) warning the public not to sell land to Muslims "who engage in every type of subversive activity," and (3) pledging full support of his office to the white citizens of St. Clair County. Defendant Brewer in his weekly news conference pledged full support of his office to the various court proceedings against Billingsley, Holmes and PLD. Also, Brewer

sent a telegram of support to the rally of St. Clair County citizens on November 21.

On December 2, the trustees of Pine Forest Missionary Baptist Church instituted a civil action in the Circuit Court of St. Clair County against some twenty defendants, including plaintiffs Billingsley, Holmes, and Davis and PLD. The complaint seeks damages in the amount of $250,000.00 for aggravated trespass and $250,000.00 for denying and infringing upon the church's use of its land.

On December 4, 1969, plaintiff Davis was arrested on a warrant sworn to by defendant Bishop on a charge of violating Code of Alabama, Title 10, § 21 (94). This charge developed when defendant Wyatt purchased a $5 check from a local service station where Davis had purchased gasoline with the check.

On January 7, 1970, plaintiff Davis was arrested on a warrant issued by defendant Waid on a charge of permitting livestock to run at large (Code of Alabama, Title 3, § 95).

I. This Court has jurisdiction over the subject matter under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983. This case is a proper one for a three-judge district court under 28 U.S.C. §§ 2281, 2284.

II. Whether plaintiffs and defendants' classes are properly constituted under Rule 23, Fed.R. Civ.P.

Plaintiffs in their complaint contend that the members of plaintiffs' class are (1) Negro citizens of Alabama and their attorneys and (2) members, friends and associates of the Lost Found Nation of Islam. Defendants are alleged to repre-sent: (1) all circuit and county officials and other persons in Alabama; (2) all members of Restore Integrity to Development (RID); (3) all district attorneys, assistant district attorneys, county solicitors and county attorneys in Alabama; and (4) all sheriffs in Alabama. Plaintiffs further contend that the prerequisites of Rule 23(a), (b)(1), (b)(2) and (b)(3) are satisfied.

Rule 23(a) states four requisites for bringing a class action.[3] In addition, the case must satisfy one of the three requirements of Rule 23(b). Rule 23 (c)(1) provides that a court should determine "as soon as practicable after the commencement of an action" whether the class action complies with Rule 23 (a) and (b). If the court determines that the suit is not properly brought as a class action, the action may be treated as an individual suit by the named plaintiffs,[4] or the class can be divided into subclasses which must separately meet the requirements of Rule 23(a) and (b). See Rule 23(c)(4).

As to the classes plaintiffs allegedly represent, the class all "Negro citizens of Alabama and their attorneys" is entirely too broad in the context of this litigation. The plaintiffs premise their action principally on a violation of their first and fourteenth amendment rights and their right under 42 U.S.C. §§ 1981 and 1982 to make contracts and to hold and own property in connection with an attempt by Black Muslims to purchase land and operate farms in St. Clair County. The class action considered in this context does not meet two of the requirements of Rule 23(a): "(2) there are questions of law or fact common to the class" and "(3) the claims * * * of the representative parties are typical

---

3. "(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

4. 2 Barron & Holtzoff, Federal Practice & Procedure § 567 (Wright ed. 1968).

of the claims \* \* \* of the class \* \* \*."[5]

■ The other class which plaintiffs claim to represent — members, friends and associates of the Lost Found Nation of Islam—satisfies the class action requirements of Rule 23(a) and Rule 23(b)(2).[6] It could conceivably be argued that the class is not so numerous that joinder of all members is impracticable. See Rule 23(a)(1). However, impossibility of joinder is not required;[7] it is difficult to determine at this time which members of the Lost Found Nation, if any, will be working on the farms in St. Clair County and who their "friends" and "associates" will be.

■ As to the class defendants are alleged to represent,[8] Rule 23 is not satisfied for the same reasons given above with respect to plaintiffs' class of all "Negro citizens of Alabama and their attorneys." See Rules 23(a)(3), 23(b)(2). The individual defendants are allegedly attempting to prevent Black Muslims, their friends and associates from developing a farm in St. Clair County. It is only speculative whether plaintiffs will attempt to develop farms in other areas of Alabama and, if they attempt to do so, whether the officials in that county will initiate a planned program to prevent the development.[9]

Defendants also allegedly represent the class "all members of Restore Integrity to Development." The deposition of one defendant discloses that there are four members in this organization, which evidence is uncontradicted. Therefore Rule 23(a)(1) is not satisfied and the attempted joinder of this particular class must fail.

In summary, the only class which meets the requirements of Rule 23 is plaintiffs' class—members, friends and associates of the Lost Found Nation of Islam. Otherwise, the parties to this action are the individual plaintiffs and defendants.

### III. The constitutionality of various state statutes.

Plaintiffs contend that Code of Alabama, Title 14, §§ 97(1)–(8) and Title 10, §§ 21(93) and 21(94) are unconstitutional on their face and as applied to

---

5. See Palmer v. Thompson, 391 F.2d 324 (5 Cir. 1967). Plaintiffs rely on Cypress v. Newport News General and Nonsectarian Hospital Ass'n, 375 F.2d 648 (4 Cir. 1967) and Potts v. Flax, 313 F.2d 284 (5 Cir. 1963). In both cases the claims of the individual plaintiffs clearly involved questions of law or fact common to the class and were typical of the claims of the class. Cypress v. Newport News General and Nonsectarian Hospital Ass'n, supra (desegregation action brought on behalf of all doctors seeking admission to hospital staff privileges); Potts v. Flax, supra (school desegregation action brought on behalf of all other Negro children similarly situated).

6. "(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 " \* \* \* \*
 "(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

7. Wright, Class Actions, 47 F.R.D. 169, 172 (1969).

8. All circuit and county officials in Alabama; all district attorneys, assistant district attorneys, county solicitors, and county attorneys in Alabama; and all sheriffs in Alabama.

9. The authority cited by plaintiffs is inapplicable. In both cases, the plaintiffs' claims and relief sought were clearly aimed at a specific group of defendants who were properly joined as a class under Rule 23. Hadnott v. Amos, 295 F.Supp. 1003 (M.D.Ala.1968), rev'd on other grounds, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969) (class composed of all Judges of Probate in Alabama who by statute were in exclusive control of printing election ballots); Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1967), aff'd, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed. 2d 1212 (1968) (plaintiffs sought desegregation of State penal system and county and city jails; class composed of all wardens, jailers and sheriffs in Alabama).

plaintiffs. They also contend that Title 14, § 426 is unconstitutional as applied 'to plaintiffs. In addition, plaintiffs allege that the arrest of individual plaintiffs under these statutes is pursuant to a planned scheme of bad faith enforcement to prevent the Black Muslims, specifically plaintiffs and the class which they represent, from developing a farm in St. Clair County. The bad faith enforcement of these statutes will be discussed below in connection with injunctive relief.

*Sections 97(1)–(8), Title 14, Code of Alabama.*

 Initially, it should be pointed out that the statutory scheme, Title 14, §§ 97(1)–(8), pertains to the communist party, members of the communist party, communist front organizations, and members of communist front organizations. The one exception is section 97 (4a) which requires the registration of communists, nazis, muslims and members of communist front organizations. The statutory scheme is thus applicable to plaintiffs only insofar as section 97(4a) requires them to register as muslims. Therefore, plaintiffs have standing only to challenge the constitutionality of section 97(4a), and not the entire statutory scheme. *See* Jenkins v. McKeithen, 395 U.S. 411, 423–425, 89 S.Ct. 1843, 23 L.Ed. 2d 404 (1969); Flast v. Cohen, 392 U.S. 83, 99–106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Plaintiffs challenge the constitutionality of section 97(4a),[10] both on its face

---

10. "§ 97(4a). *Registration of communists, nazis, muslims, officers of communist party and officers and members of communist front organizations.*—1. Each person remaining in this state for as long as one day who is a communist, nazi or muslim or is knowingly a member of a communist front organization, shall register with the department of public safety on or before the fifth consecutive day that such person remains in this state, and at such intervals thereafter as may be directed by the department of public safety.

"2. Such registration shall be under oath and shall set forth the name (including any assumed name used or in use), address, business occupation, purpose of presence in the state of Alabama, sources of income, place of birth, places of former residence, and features of identification, including fingerprints, of the registrant; organizations of which registrant is a member; names of persons known by registrant to be communists, nazis or muslims or members of any communist front organization as the case may be; and any other information requested by the department of public safety which is relevant to the purposes of this section.

"3. Each and every officer of the communist party and each and every officer of communist front organizations, knowing said organizations to be communist front organizations, and each and every member of nazi or muslim organizations, knowing said organizations to be nazi or muslim organizations, shall register or cause to be registered said party or organizations with the department of public safety, if said party or organizations have any members who reside, permanently or for a period of more than thirty days, in the state of Alabama. Such registration shall be under oath and shall include the name of the organization, the location of its principal office and of its offices and meeting places in the state of Alabama; the names, real and assumed, of its officers; the names, real and assumed, of its members in the state of Alabama and of any person who has attended its meetings in the state of Alabama; a financial statement reflecting receipts and disbursements and by whom and to whom paid; and any other information requested by the department of public safety which is relevant to the purposes of this statute. Such registrations shall be made within thirty days after the effective date of this section, and thereafter at such intervals as are directed by the department of public safety.

"4. Failure to register as herein required, or the making of any registration which contains any false statement or any omission, shall constitute a felony and shall be punishable by a fine of not less than $1,000 or more than $10,000, or by imprisonment in the penitentiary for not less than two or more than ten years, or by both.

"5. The registration records shall be open to inspection by all law enforcement officers of the United States, of this state or of any other state or territory of the United States. Such records may also, in the discretion of the department of public safety, be open for inspection by the general public."

and as applied, on grounds: (1) that the statute infringes upon first amendment rights due to vagueness and overbreadth; (2) that it violates the self-incrimination clause of the fifth amendment; and (3) that the statute is invalid under the pre-emption doctrine to the extent it purports to regulate and control subversive activities. Because we find section 97(4a) unconstitutional on first amendment grounds, we do not reach plaintiffs' last two contentions.

Thre are two approaches in examining the statute's effect on first amendment rights: (1) Whether the Black Muslims and the Lost Found Nation of Islam constitute a religion, and, if so, whether section 97(4a) intrudes upon their freedom of religion (and thus violates the free exercise clause of the first amendment); or (2) whether the statute constitutes a vague and overbroad condemnation of political association, thus infringing upon plaintiffs' freedom of association. Our analysis of the statute is limited to the second approach.

 It is clear that sweeping condemnations of political association must fall as vague and/or overbroad. United States v. Robel, 389 U.S. 258, 265–266, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Elfbrandt v. Russell, 384 U.S. 11, 18–19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307–308, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Although a state may have a legitimate and valid governmental purpose,[11] "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); see Elfbrandt v. Russell, supra, 384 U.S. at 18, 86 S.Ct. 1238; Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961).

The defendants contend that the State of Alabama has a right to protect itself against anarchy and therefore section 97(4a) is a reasonable exercise of its police power. In asserting this right, the defendants rely on New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928) and Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). Both of these cases are distinguishable.

In *Bryant* the Court upheld a New York statute requiring any unincorporated association which demanded an oath as a condition to membership to file with State officials a list of its membership. The Court emphasized the nature of the organization which New York sought to regulate, the Ku Klux Klan, and concluded that the State had a valid interest in requiring disclosure.[12] "The decision was based on the particular character of the Klan's activities, involving acts of unlawful intimidation and violence, which the Court assumed was before the state legislature when it enacted the statute, and of which the Court itself took judicial notice."[13] In this case, we cannot assume that "acts of unlawful intimidation and violence" were before the Alabama legislature when it enacted section 97(4a) in

---

11. *See* Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 88–105, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959); New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928).

12. The plaintiffs attacked the constitutionality of the statute on due process and equal protection grounds and not on first amendment grounds.

13. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 465, 78 S.Ct. 1163, 1173, 2 L.Ed.2d 1488 (1958); *see* Communist Party v. Subversive Activities Control Bd., *supra*, 367 U.S. at 101–102, 81 S.Ct. 1357; NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 310, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 568–569, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963) (Douglas, J., concurring).

September 1961.[14] Nor is there sufficient evidence in the record or elsewhere for the Court to conclude or to take judicial notice that the Black Muslims have engaged in "acts of unlawful intimidation and violence" in the State of Alabama.[15]

In Communist Party v. Subversive Activities Control Bd., *supra,* the Supreme Court upheld the constitutionality of the requirement in the Subversive Activities Control Act of 1950 that the Communist Party register. In concluding that the registration requirement did not violate the freedoms of expression and association protected by the first amendment, Justice Frankfurter repeatedly emphasized that the Act applied "only to *foreign-dominated* organizations which work primarily to advance the objectives of a world movement controlled by the government of a *foreign* country." 367 U.S. at 104, 90, 93–94, 95–97, 102, 105, 81 S.Ct. at 1414 (emphasis by Court). With such strong emphasis on the particular nature of the organization, this decision is not authority for defendants' valid-state-interest argument.

■■ Where a state attempts regulation in the first amendment area,

"[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Here, the statute closely touches the freedom of association guaranteed by the first amendment.[16] "Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama ex rel. Patterson, *supra,* 357 U.S. at 460–461, 78 S.Ct. at 1171. Section 97(4a) does not withstand this required close scrutiny and is impermissibly vague and overbroad in several aspects.

■ In subsections 2 and 3 of section 97(4a), a registrant and a member of a muslim organization registering his organization are required to give "any other information requested by the department of public safety which is relevant to the purposes of this section." With emphasis on precision in statutory regulation in the first amendment area, this requirement is obviously vague and overbroad.[17]

14. There is not sufficient evidence in the record that the Black Muslims in 1961 promoted or participated in acts of intimidation and violence. Although a separate nation of blacks is one ultimate goal of the Black Muslims, the record is devoid of evidence that they are seeking this goal through violence or intimidation. *See generally* 75 Harv.L.Rev. 837, 838–39 (1962).

15. The continued validity of the *Bryant* decision has been questioned in light of the development of the first amendment right of freedom of association. See Gibson v. Florida Legislative Investigation Committee, *supra,* 372 U.S. at 568–570, 83 S.Ct. 889.

16. It is beyond dispute that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." NAACP v. Alabama ex rel. Patterson,

*supra,* 357 U.S. at 460, 78 S.Ct. at 1171; see United States v. Robel, *supra,* 389 U.S. at 263 and n. 7, 88 S.Ct. 419; Elfbrandt v. Russell, *supra,* 384 U.S. at 18, 86 S.Ct. 1238; Gibson v. Florida Legislative Investigation Committee, *supra,* 372 U.S. at 543, 83 S.Ct. 889; Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 250–251, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

17. *See* NAACP v. Button, *supra,* 371 U.S. at 432–433, 83 S.Ct. at 338:
 "The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. Cf. Marcus v. Search Warrant, 367 U.S. 717, 733, [81 S.Ct. 1708, 1717, 6 L.Ed.2d 1127].

In subsection 1, all "muslims" who remain in Alabama for one day must register with the department of public safety. No definition of muslim is included in the statute. Although reference is made in subsection 3 to "muslim organizations," this does not sufficiently define the term "muslim." In requiring *all* muslims to register, whether or not they are members of an organization in which the state has a legitimate interest, the statute is susceptible to constitutional attack on grounds of overbreadth. As noted above, although a state may have a legitimate interest in an area, that interest cannot be pursued by means that broadly stifle first amendment rights when the end can be more narrowly achieved. Shelton v. Tucker, *supra*, 364 U.S. at 488, 81 S.Ct. 247.

When registering the muslim organization, a member is required by subsection 3 to list all members in the organization. This requirement is a restraint upon the first amendment freedom of association. NAACP v. Alabama ex rel. Patterson, *supra;* Louisiana ex rel. Gremillion v. NAACP, *supra;* Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *see* United States v. Robel, *supra*, 389 U.S. at 266 n. 16, 88 S.Ct. 419; Gibson v. Florida Legislative Investigation Committee, *supra*, 372 U.S. at 544, 83 S.Ct. 889. The cases which upheld the validity of a state satute requiring production of membership lists, New York ex rel. Bryant v. Zimmerman, *supra*,[18] and which upheld the registration requirement for the Communist Party, Communist Party v. Subversive Activities Control Bd., *supra*, on grounds that there was a legitimate and substantial governmental interest, are distinguished for reasons set forth above. See pp. 440 and 441, *supra*.[19]

Because of these defects, the statute suffers the constitutional infirmity of vagueness and overbreadth. Even if these defects are removed and the statute is construed to apply only to Black Muslims, it is doubtful whether their registration is constitutionally permissible. Most registration cases or other freedom of association cases are concerned with production of membership lists[20] or with employment oaths.[21] We have located

These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Cf. Smith v. California, *supra* [361 U.S. 147], at 151–154 [80 S.Ct. 215, 217–219, 4 L.Ed.2d 205]; Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."

18. Production of membership lists was also upheld in Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959). The nexus between the organization whose membership list was sought and the communist movement in New Hampshire furnished adequate justification for the state investigation. 360 U.S. at 79, 79 S.Ct. 1040. *But cf.* DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966). *Uphaus*, as in Communist Party v. Subversive Activities Control Bd., *supra*, emphasized the Communist Party movement and, therefore, is limited to those particular facts.

19. Another possible constitutional defect is found in subsection 1 which requires registration of "each person remaining in this state for as long as one day * * *." An argument could be made that the one-day requirement violates one's constitutional right to travel from state to state. *See* Shapiro v. Thompson, 394 U.S. 618, 629–633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); United States v. Guest, 383 U.S. 745, 757–758, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

20. Louisiana ex rel. Gremillion v. NAACP, *supra*; Bates v. City of Little Rock, *supra*; Gibson v. Florida Legislative Investigation Committee, *supra*; NAACP v. Alabama ex rel. Patterson, *supra*.

21. Elfbrandt v. Russell, *supra*; Keyishian v. Board of Regents, etc., 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Cramp v. Board of Instruction of Orange County, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *see* Shelton v. Tucker, *supra*.

few cases dealing with registration of individual members, all of which have held the registration unconstitutional for reasons that are inapplicable in this case.[22]

However, the first amendment reasoning of the Supreme Court in the production of membership list cases is equally applicable where the statute requires registration of individual members. *See* NAACP v. Alabama ex rel. Patterson, *supra*, 357 U.S. at 460–466, 78 S.Ct. 1163; Louisiana ex rel. Gremillion v. NAACP, *supra*, 366 U.S. at 296–297, 81 S.Ct. 1333; Gibson v. Florida Legislative Investigation Committee, *supra*, 372 U.S. at 543–544, 550–551, 83 S.Ct. 889. This reasoning was best exemplified in NAACP v. Alabama ex rel. Patterson, *supra*, 357 U.S. at 462, 78 S.Ct. at 1171–1172:

"This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. When referring to the varied forms of governmental action which might interfere with freedom of assembly, it said in American Communications Ass'n. v. Douds, *supra* [339 U.S. 382] at 402 [70 S.Ct. 674 at 686, 94 L.Ed. 925]: 'A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature.' Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order. Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs. Cf. United States v. Rumley, *supra* [345 U.S. 41] at 56–58 [73 S.Ct. 543 at 550–551, 97 L.Ed. 770] (concurring opinion)."

■ The defendants argue that the State of Alabama had a legitimate interest and purpose in requiring muslims to register. Although the question of legitimate state purpose remains a pertinent inquiry,[23] the cases in which the Supreme Court has found a legitimate and substantial governmental interest are clearly distinguishable. See pp. 440–441 and note 18, *supra*. Here, defendants have not presented sufficient evidence "of [an] 'overriding and compelling state interest' that would warrant intrusion into the realm of political and associational privacy protected by the First Amendment." DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 829, 86 S.Ct. 1148, 1151, 16 L.Ed.2d 292 (1966); *see* Gibson v. Florida Legislative Investigation Committee, *supra*, 372 U.S. at 546, 83 S.Ct. 889.[24]

For the above reasons, we conclude that section 97(4a) is an unconstitutional abridgement upon the first amendment right of freedom of association.

22. In Albertson v. Subversive Activities Control Bd., 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), the Court held that registration of individual members of the Communist Party, as required by the Subversive Activities Control Act, violated the self-incrimination clause of the fifth amendment. In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the Court held that registration of a member of a communist front organization, as required by a Louisiana statute, was impermissible because of an invalid presumption in the statutory definition of communist front organization. A similar presumption is not included in section 97(4a).

23. *See* Gibson v. Florida Legislative Investigation Committee, *supra*, 372 U.S.

at 546, 83 S.Ct. 889; NAACP v. Button, *supra*, 371 U.S. at 439, 83 S.Ct. 328; NAACP v. Alabama ex rel. Patterson, *supra* 357 U.S. at 463–466, 78 S.Ct. 1163; cases cited in note 11, *supra*.

24. Plaintiffs also allege that section 97 (4a) is unconstitutional as applied. They contend that the State's prosecution under the statute violates the equal protection clause of the fourteenth amendment, noting in their brief, p. 15, that other orthodox muslims live in Alabama and have not been required to register under section 97(4a). Because we have concluded that the statute is unconstitutional on its face, we do not reach this contention.

**444**

*Sections 21 (93) & (94), Title 10, and Section 426, Title 14, Code of Alabama.*

Plaintiffs also challenge the constitutionality of Title 10, §§ 21(93) and 21(94) and Title 14, § 426, Code of Alabama. Their attack on the constitutionality of these statutes is cursory; their principal argument is that defendants were using these statutes as a means of harassment in denying plaintiffs certain constitutional rights. This contention will be discussed below in connection with plaintiffs' request for injunctive relief.

Both sections 21(93) and 21(94) prohibit an individual from acting as an agent of an unregistered foreign corporation.[25] Section 21(93) provides for a maximum fine of $500, while section 21(94) authorizes sanctions of $1000 maximum fine and/or twelve months' imprisonment. Contending that each section prohibits the same conduct, plaintiffs argue that state officials are granted complete discretion to charge one accused of acting as an agent of an unregistered corporation with violating either a criminal statue or a civil statute.

Initially, it should be pointed out that plaintiffs' premise that each section prohibits the identical conduct is not entirely accurate. Section 21(93) prohibits any person to act as an agent *or* to trans-

act business for (or on behalf of) any unregistered foreign corporation. Section 21(94) prohibits any unregistered foreign corporation, its agents, its servants, or its officers from making any contract, agreement, undertaking or engagement with or on behalf of the foreign corporation. Although certain acts could fall within the conduct proscribed by both sections, the sections are not totally or entirely focused on identical conduct.

■■■ Even assuming that the sections were identical in the conduct proscribed, there would seem to be no constitutional infirmity unless plaintiffs could demonstrate that state officials were enforcing the statute unequally, *e. g.*, that only members of their class were being prosecuted under section 21(94), while all other violations were brought under section 21(93). However, we pretermit consideration of whether there has been unequal enforcement of the statutes.[26] To obtain equitable relief from state prosecution in this case, the plaintiffs must attack the state statute on its face as abridging first amendment rights, Dombrowski v. Pfister, 380 U.S. 479, 489–490, 85 S.Ct. 1116, 14 L.Ed. 2d 22 (1965), instead of challenging the constitutionality of the statute on the ground that it is unequally enforced in violation of the equal protection clause of the fourteenth amendment.

25. "§ 21(93). *Unlawful to act as agent of foreign corporation before such instrument is filed; penalty.*—It is unlawful for any person to act as agent or transact any business, directly or indirectly, in this state for or on behalf of any foreign corporation which has not designated a known place of business in this state and an authorized agent or agents residing thereat, as required in this chapter; and any person so doing shall, for each offense, forfeit and pay to the state the sum of five hundred dollars."

"§ 21(94). *Foreign corporations, their agents, officers, etc., contracting or doing business in state without license, penalty for.*—Any foreign corporation or any person acting as agent, servant, or officer of such foreign corporation who shall make or attempt to make any contract, agreement, undertaking, or engagement with,

by, or in the name of or for the use or benefit of any such corporation without a license authorizing such corporation to do business in this state, or after such license shall have been cancelled, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than one hundred dollars, nor more than one thousand dollars and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than twelve months, one or both, at the discretion of the jury trying the case."

26. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), does not require us to resolve this issue. In *Zwickler*, the statute was attacked on its face, for reasons of vagueness and overbreadth, as abridging first amendment rights. *See* Cato v. Georgia, 302 F.Supp. 1143 (N.D.Ga.1969).

Plaintiffs also attack the constitutionality of Title 14, § 426,[27] claiming that it is unconstitutionally applied. For the reasons given in the preceding paragraph, we pretermit consideration of this contention.

### IV. Alabama Legislative Commission to Preserve the Peace.

Plaintiffs also attack the constitutionality of House Joint Resolution No. 5 which establishes the Legislative Commission to Preserve the Peace. In challenging the validity of the Resolution, plaintiffs do not contend that the State of Alabama cannot establish a legislative commission to investigate areas of legitimate state interest. Nor do they contend that none of the Commission's present activity is in furtherance of legitimate state interests (e. g., drug usage, campus disorder). Plaintiffs do contend, however, that the delegation of authority from the State Legislature, through the enabling resolution, is too vague and overbroad to indicate sufficiently the scope of the Commission's power to investigate.

Although the defendants do not challenge plaintiffs' standing, we must determine that issue in that the question of standing goes to the court's jurisdiction. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). In McKeithen the plaintiff challenged the constitutionality of a Louisiana Legislative Commission, both on its face and as applied. Plaintiff's standing was challenged on grounds that (1) he had not been called before the Commission to testify, nor did he expect to be called in the future, and (2) he had not demonstrated that he had been, or would be, injured by the operation of the challenged statute.

The Court found that the complaint "allege[d] that the Commission and those acting in concert with it have taken and will take in the future certain actions" against plaintiff.[28] These allegations were sufficient to create the threat "of direct and substantial injury to his own legally protected interest to accord him standing to challenge the constitutionality of [the legislative commission]." 395 U.S. at 425, 89 S.Ct. at 1850. The key language of the Court seems to be:

"The decisions of this Court have also made it clear that something more than an 'adversary interest' is necessary to confer standing. There must in addition be some connection between the official action challenged and some legally protected interest of the party challenging that action. See Flast v. Cohen, supra [392 U.S. 83], at 101–106 [88 S.Ct. at 1953–1955, 20 L.Ed.2d 947]." 395 U.S. at 423, 89 S.Ct. at 1850.

In this case plaintiffs possess a sufficient adversary interest to insure proper presentation of issues facing the Court. The allegations in the complaint[29] indicate that there is a connec-

---

27. "§ 426. *Trespass after warning.*—Any person who, without legal cause or good excuse, enters into the dwelling house or on the premises of another, after having been warned within six months preceding, not to do so; or any person, who, having entered into the dwelling house or on the premises of another without having been warned within six months not to do so, and fails or refuses, without legal cause or good excuse, to leave immediately on being ordered or requested to do so by the person in possession, his agent or representative, shall, on conviction, be fined not less than $25 nor more than $100, and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than three months."

28. 395 U.S. at 422–423, 89 S.Ct. at 1849. Plaintiff's allegations were that the Commission was an "executive trial agency" whose function was to conduct public trials designed to find plaintiff guilty of violating criminal laws for the sole purpose of injuring him, and that the Commission was actually engaged in a course of conduct designed publicly to brand plaintiff and others as criminals.

29. Specially, plaintiffs contend that the Commission through its director has entered into a course of conduct intended to remove plaintiffs from St. Clair County.

tion between the activities of the Commission, through its director Strickland, and the first amendment rights and legally protected interests of plaintiffs [30] in buying land and making contracts.

Decisions of the Supreme Court clearly demonstrate that state legislatures have the right to conduct investigations through a duly authorized committee in order to protect a state's legitimate and vital interests. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 544–545, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Barenblatt v. United States, 360 U.S. 109, 111, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Uphaus v. Wyman, 360 U.S. 72, 78–81, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959); Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). However, the investigative power, as exercised by the committees, has been subject to abuse. Recent decisions have recognized that vital first amendment freedoms may be abridged by legislative investigations.[31]

The power to investigate is not unlimited.

In challenging the constitutionality of the resolution on its face, plaintiffs contend: "(a) it specifies no legitimate legislative purpose and § 5 thereof partially negates any legislative purpose; (b) it is vague and overly broad, the language being inherently subject to abuse and authorizing substantial impingement on first, thirteenth, fourteenth, and fifteenth amendment rights (particularly those of speech, association, and Negro equality); (c) it authorizes compulsory exposure of an individual's activities, associations, and beliefs protected by the first and fifth amendments; (d) it provides no showing of a compelling state interest justifying its provisions; (e) it authorizes hearings and investigation for the sole purpose of exposure to the detriment and injury of plaintiffs and the class they represent and without the requisites of judicial due process as found in the fourth, fifth, sixth, seventh, and eighth amendments (e. g., rights of confrontation of witnesses, cross examination, standards of evidence and adjudication, presentation of evidence in one's own defense and the obtaining thereof by compulsory process); (f) it authorizes a

"There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. * * * Nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible."

Watkins v. United States, *supra* at 187, 77 S.Ct. at 1179. The crucial inquiry in examining the validity of a legislative commission is the existence of a legitimate interest of a state and the weight to be given that interest when an individual's first amendment rights are involved. That accommodation of these two "rights" is a difficult task for a court was recognized by the Supreme Court in *Gibson:*

"It is no less obvious, however, that the legislative power to investigate,

legislative body to perform an accusatory function with no constitutional safeguards or the requirement of cross-sectional or public representation constitutionally applicable to grand juries. All of the foregoing is in violation of Article 1 § 10 of the Constitution of the United States (bill of attainder clause) and the first, fourth, fifth, sixth, seventh, eighth, ninth, thirteenth, fourteenth, and fifteenth amendments, and 42 U.S.C. §§ 1981, 1982, 1983, and 1985."

30. 42 U.S.C. §§ 1981, 1982. *See* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414, 88 S.Ct. 2186, 20 L.Ed. 2d 1189 (1968).

31. DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); Gibson v. Florida Legislative Investigation Committee *supra*; Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Liveright v. Joint Committee of General Assembly of Tennessee, 279 F.Supp. 205 (M.D.Tenn. 1968).

broad as it may be, is not without limit. The fact that the general scope of the inquiry is authorized and permissible does not compel the conclusion that the investigatory body is free to inquire into or demand all forms of information. Validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands. *See, e. g.,* Watkins v. United States, *supra,* 354 U.S. [178], at 197–199 [77 S.Ct. 1173, at 1184]. See also Barenblatt v. United States, *supra,* 360 U.S. [109], at 127–130 [79 S.Ct. 1081, at 1094]. When, as in this case, the claim is made that particular legislative inquiries and demands infringe substantially upon First and Fourteenth Amendment associational rights of individuals, the courts are called upon to, and must, determine the permissibility of the challenged actions, Watkins v. United States, *supra,* 354 U.S. [178], at 198–199 [77 S.Ct. 1173, at 1184–1185]; '[T]he delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights,' Schneider v. State, 308 U.S. 147, 161 [60 S.Ct. 146, 151, 84 L.Ed. 155]."

372 U.S. at 545, 83 S.Ct. at 893; *see* Liveright v. Joint Committee, etc., *supra,* 279 F.Supp. at 216.

In addition to demonstrating a legitimate state interest,

"it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest. * * * 'Where there is a significant encroachment upon personal liberty, the State may pre-

vail only upon showing a subordinating interest which is compelling.' [Bates v. City of Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480]."

372 U.S. at 546, 83 S.Ct. at 893–894. To insure that these requirements are complied with, the legislature must describe with sufficient particularity the committee's jurisdiction and powers.

Plaintiffs in challenging the constitutionality of Resolution No. 5 on its face contend that the Resolution's delegation of authority is too vague and overbroad, thus giving the Commission authority "to pick its targets, whether or not they are valid objectives * * *." The authority delegated to the Commission is stated in section 1:

"Said joint legislative committee is hereby authorized and empowered to study, investigate, analyze and interrogate persons, groups and organizations *who may be engaged in activities of an unlawful nature* against the sovereignty of the State of Alabama, and *which may be detrimental to the peace and dignity* of the State of Alabama * * *." [Emphasis added.]

The broad purpose of the Commission is found in the preamble of the Resolution:

"WHEREAS, certain persons, groups, and organizations have been and are engaged in activities in the State of Alabama which are of an *unlawful nature,* endanger the sovereignty of the State of Alabama, and threaten the peace and dignity of the State of Alabama; and

"WHEREAS, it is deemed necessary, proper and expedient to establish an agency or commission *to do and perform any and all acts and things necessary and proper* to preserve the peace and dignity of the State of Alabama." [Emphasis added.]

Plaintiffs raise valid grounds for objecting to the authority of legislative investigatory commissions. It is essential that delegation of authority from the legislature to its commission must be spe-

cific and not vague or overbroad.[32] The requirement of specificity was emphasized in *Sweezy*:

> "There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals. It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas, particularly in the academic community. Responsibility for the proper conduct of investigations rests, of course, upon the legislature itself. If that assembly chooses to authorize inquiries on its behalf by a legislatively created committee, that basic responsibility carries forward to include the duty of adequate supervision of the actions of the committee. This safeguard can be nullified when a committee is invested with a broad and ill-defined jurisdiction. The authorizing resolution thus becomes especially significant in that it reveals the amount of discretion that has been conferred upon the committee."

354 U.S. at 245, 77 S.Ct. at 1209.

Where a legislative committee's authorization is vague or overbroad, "it is impossible * * *, with constitutional freedoms in jeopardy, to declare that the Committee has ranged beyond the area committed to it by its parent assembly * * *. It is impossible in such a situation to ascertain whether any legislative purpose justifies the disclosures sought, and if so, the importance of that information to the [legislature] in furtherance of its legislative function." Watkins v. United States, *supra*, 354 U.S. at 205, 206, 77 S.Ct. at 1188. Thus, legislative committees or commissions proceeding under vague or broad delegations of authority are allowed to define their own authority, to choose the direction and focus of their activities. These powers, in order to insure that there is a compelling state interest for investigation, can be exercised *only* by the state legislature.

■ The Commission to Preserve the Peace is authorized to study, investigate, analyze and interrogate anyone "who may be engaged in activities of an unlawful nature against sovereignty of the State of Alabama" and "which may be detrimental to the peace and dignity of the State of Alabama." This authorization of investigatory power is at least, if not more, vague and overbroad than the authorizations found vague and overbroad in *Watkins* and *Sweezy*, 354 U.S. at 201–202, 77 S.Ct. 1173, 354 U.S. 236–237, 77 S.Ct. 1203.[33]

■ Because the authorization of investigatory power in House Joint Resolution No. 5 is vague and overbroad, the Commission can investigate a broad variety of topics whether or not there exists a legitimate state interest to justify the invasion of first amendment rights. The Commission can investigate and disclose its findings without demonstrating the nexus between the valid legislative purpose and the particular individuals being investigated. Where exposure may retard the right of the individual to speak and associate freely, we cannot presume that the exposure by this Commission

32. Gibson v. Florida Legislative Investigation Committee, *supra*, 372 U.S. at 545, 557–558, 83 S.Ct. 889; Sweezy v. New Hampshire, 354 U.S. 234, 245, 253–254, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Watkins v. United States, *supra*, 354 U.S. at 201, 204–205, 77 S.Ct. 1173; *see* United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

33. Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), is not to the contrary. There, the Court found that the vagueness of the authorizing resolution was not fatal. The resolution had obtained a "persuasive gloss of legislative history" which clearly defined the committee's power to investigate. In this case there is no legislative history to cure the vagueness and overbreadth of House Joint Resolution No. 5.

will be pursuant to a legitimate legislative purpose.[34]

We therefore find that Resolution No. 5 is void on its face for vagueness and overbreadth.[35] It is peculiarly susceptible of a "sweeping and improper application." Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). We are not holding that the State of Alabama cannot investigate through legislative commissions subject matters, groups or individuals in which there is an overriding or compelling state interest. However, the legislature must carefully delineate the scope of inquiry which the commission is authorized to make.

Plaintiffs also attack the constitutionality of House Joint Resolution No. 5 as applied to them. Specifically, they contend that the Commission through its director has entered into a course of conduct intended to remove plaintiffs from St. Clair County.

The crucial inquiry as above, is the existence of a legitimate interest in the State to investigate Black Muslims and a nexus between the information sought and this compelling state interest. Gibson v. Florida Legislative Investigation Committee, *supra*, 372 U.S. at 546, 83 S.Ct. 889. Moreover, to insure that these two requirements are satisfied, the delegation of authority from the state legislature to the Commission must be specific and not vague or overbroad. See cases cited in note 32, *supra*. Where the authorization of investigatory power is vague or overbroad (and we have concluded above that Resolution No. 5 is vague and overbroad), specific conduct by a commission cannot be justified, where constitutional freedoms are in

jeopardy, as pursuant to a legitimate legislative purpose. Watkins v. United States, *supra*, 354 U.S. at 205, 206, 77 S.Ct. 1173.

█ From a legal viewpoint, plaintiffs have valid grounds to challenge the Commission's conduct. However, we have concluded that plaintiffs have not presented evidence that the Commission through its director Strickland has entered a course of conduct intended to remove plaintiffs from St. Clair County. Strickland, at the request of several other defendants, made a speech in St. Clair County in which he described the activities and beliefs of the Black Muslim organization. However, the evidence presented by plaintiffs is inadequate proof that Strickland was engaged in a course of conduct designed to force plaintiffs from St. Clair County.

## V. Equitable Relief.

Defendants, without reaching the merits of plaintiffs' specific claims, initially contend that plaintiffs are not entitled to equitable relief. They argue that the Black Muslim organization is not a religion but a political organization whose sole advocacy is violence and black racism and whose purpose in St. Clair County is to establish, by means of force if necessary, a separate nation of its own. Defendants also contend that equitable relief is precluded by (a) plaintiffs' failure to show irreparable injury; (b) 28 U.S.C. § 2283; and (c) the doctrine of abstention. Each of these contentions, however, must fail.

Defendants' argument that Black Muslims are attempting to establish a foreign nation in St. Clair County is premised on its initial contention that Black Muslims

---

34. Watkins v. United States, *supra*; Liveright v. Joint Committee, etc., *supra*. Justices Black, Douglas and Brennan have adhered to the view that a state, even under the guise of legitimate state interest, could not infringe upon first amendment rights. Hannah v. Larche, 363 U.S. 420, 493, 80 S.Ct. 1502, 4 L.Ed. 2d 1307 (1960) (Douglas, J., dissenting); Jenkins v. McKeithen, *supra*, 395 U.S. at 432, 89 S.Ct. 1843 (Black, J., concurring); Barenblatt v. United States, *supra*, 360 U.S. at 134 (Black, J., dissenting), 166, 79 S.Ct. 1081 (Brennan, J., dissenting); Uphaus v. Wyman, *supra*, 360 U.S. at 82, 79 S.Ct. 1040 (Brennan, J., dissenting).

35. Because of this finding, we will not consider plaintiffs' remaining constitutional challenges to Resolution No. 5.

are members of a foreign nation or political organization, not a religion, which seeks to establish a foreign nation within the United States, and in particular in St. Clair County. They further argue that Black Muslims, as members of a foreign nation, are not citizens of the United States and thus not entitled to first or fourteenth amendment rights or equitable relief; that a state government has inherent governmental authority to protect itself against insurrection and overthrow by violence; and that the statutes attacked by plaintiffs are designed to protect the State's right to a republican form of government, guaranteed by Article 4, Section 4 of the United States Constitution.

Plaintiffs Wallace and Sledge are Black Muslims and members of the "Lost Found Nation of Islam." Both consider themselves citizens of the United States and governed by the Constitution and laws of the United States. Evidence has not been presented to this Court that Black Muslims are in fact a foreign or separate nation, or intend to establish a separate nation in Alabama or St. Clair County. Furthermore, although Black Muslims are politically active,[36] other courts have found that the Black Muslim organization is sufficiently religious in nature for its members to seek vindication of their first amendment right of freedom of religion. Walker v. Blackwell, 411 F.2d 23 (5 Cir. 1969) (also cases cited on p. 24); Long v. Parker, 390 F.2d 816, 819 n. 13 (3d Cir. 1968); Walker v. Blackwell, 360 F.2d 66 (5 Cir. 1966). Therefore, we find that Black Muslims can seek equitable

protection of first amendment-freedom of religion rights, in addition to other first amendment and constitutional rights. Our finding does not infringe upon the Constitution's guarantee to each state of a republican form of government. If a state can prove that it is threatened by insurrection or overthrow by violence, it has a legitimate interest to regulate the threatening force. Defendants have not presented sufficient evidence that Black Muslims constitute such a threat in St. Clair County or in Alabama.

Defendants further allege that equitable relief is precluded by 28 U.S.C. § 2283; by plaintiffs' failure to show irreparable injury; and by the doctrine of abstention. Section 2283 [37] does not prevent this Court from granting injunctive relief. Two recent decisions by the Fifth Circuit indicate that section 2283 is an "enactment of the principle of comity and that its prohibitions may be overcome by a showing of *Dombrowski* facts even though a state proceeding is under way." [38] The court in *Machesky* emphasized the necessity for the principle of comity to yield where first amendment rights are involved:

"In so holding we are not unaware that '[b]y that enactment, [§ 2283] Congress made clear beyond cavil that the prohibition is not to be whittled away by judicial improvisation.' Amalgamated Clothing Workers of America v. Richman Brothers Co., 1955, 348 U.S. 511, 514, 75 S.Ct. 452, 454, 99 L.Ed. 600. It follows that a federal court must yield to the important institutional interests in comity

---

36. *See* Cooper v. Pate, 382 F.2d 518 (7 Cir. 1967); 75 Harv.L.Rev. 837, 838–39 (1962). Political activism is also prevalent with another religious sect, the Jehovah's Witnesses. *See, e. g.*, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

37. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of it jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

38. Sheridan v. Garrison, 415 F.2d 699, 704 (5 Cir. 1969); *see* Machesky v. Bizzell, 414 F.2d 283, 287 (5 Cir. 1969).

where only private rights are involved. Where, however, the institutional interests in comity collides with the paramount institutional interests protected by the First Amendment, comity must yield. * * *

"This is not to say that the district court is to act as an appellate court or an overlord over the state court. It is to say that there is concurrent jurisdiction in the federal court over the same subject matter and that the federal court must act where public rights springing from the First Amendment are violated even though that violation be at the hands of a state court. The action of the federal court must be limited to intruding only to the extent that the state court order impinges on the First Amendment rights involved. The state court, no less than a state or a municipality, is not immune from the Supremacy Clause of the Constitution. Art. VI, Cl. 2, Constitution. * * *"

414 F.2d at 291; *see* Sheridan v. Garrison, *supra,* 415 F.2d at 705, 707–708. Therefore, if plaintiffs present sufficient evidence under *Dombrowski,* section 2283 does not preclude injunctive relief.[39]

■ The abstention doctrine, formulated in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), is also inapplicable. In *Dombrowski* the Court held that the abstention doctrine is inappropriate where, as in this case, statutes are attacked as abridging first amendment rights or as applied for the purpose of discouraging activities protected by the first amendment. 380 U.S. at 489, 85 S.Ct. 1116; *see* Zwickler v. Koota, 389 U.S. 241, 252, 254, 88 S.Ct. 391, 19 L.Ed.2d 444 (1968); Baggett v. Bullitt, 377 U.S. 360, 375–379, 84 S.C. 1316, 12 L.Ed.2d 377 (1964); Wright v. City of Montgomery, 406 F.2d 867, 871 (5 Cir. 1967).

■ Defendants also contend that equitable relief is not warranted in that plaintiffs have not demonstrated that they would suffer irreparable injury if equitable relief is not granted. Defendants are correct in their assertion that it is generally assumed that state courts and prosecutors will observe constitutional limitations as expounded by the Supreme Court, and the mere possibility of erroneous application of these standards will usually not amount to the irreparable injury necessary for disruption of orderly state proceedings. Dombrowski v. Pfister, *supra,* 380 U.S. at 484–485, 85 S.Ct. 1116; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). However, the *Dombrowski* Court concluded, irreparable injury would occur absent a federal court injunction where a chilling effect upon the exercise of one's first amendment rights might result from the fact of the prosecution, unaffected by its success or failure. 380 U.S. at 487, 489, 490, 85 S.Ct. 1116, 1123. As the Court noted:

" * * * appellants have attacked the good faith of the appellees in enforcing the statutes, claiming that they have invoked, and threaten to continue to invoke criminal process without any hope of ultimate success, but only to discourage appellants' civil rights activities. If these allegations state a claim under the Civil Rights Act, 42 U.S.C. § 1983, as we believe they do, see Beauregard v. Wingard, 230 F.Supp. 167 (D.C.S.D.Cal.1964); Bargainer v. Michal, 233 F.Supp. 270 (D.C.N.D.Ohio 1964), the interpretation ultimately put on the statutes by the state courts is irrelevant. For an interpretation rendering the statute inapplicable to SCEF would merely mean that appellants might ultimately prevail in the state courts. It would not alter the impropriety of appellees'

39. In *Dombrowski* the Court specifically pointed out that section 2283 does not preclude injunctions against the institution of state court proceedings, but only bars stays of suits already instituted, 380 U.S. at 484 n. 2, 85 S.Ct. 1116. *See*

Note, *Federal Power to Enjoin State Court Proceedings,* 74 Harv.L.Rev. 726, 728–29 (1961). In this case, in our opinion criminal proceedings, within the meaning of section 2283, have been instituted pursuant to all five charges.

invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities, as appellees allegedly are doing and plan to continue to do."

380 U.S. at 490, 85 S.Ct. at 1123; see Sheridan v. Garrison, *supra*, 415 F.2d at 707. With these principles in mind, we now proceed to the merits of plaintiffs' claims for equitable relief.

Plaintiffs request that defendants be enjoined from various conduct, both present and future: (1) That the various state criminal prosecutions [40] be enjoined; (2) that the state civil action for trespass against plaintiffs and others be enjoined; (3) that the director and members of the Alabama Legislative Commission to Preserve the Peace be enjoined from proceeding or acting in any manner pursuant ·to Alabama Joint House Resolution No. 5; and (4) that all defendants should be enjoined from further conduct harassing, threatening, etc., plaintiffs in exercising their first amendment rights and their sections 1981 and 1982, 42 U.S.C., rights to hold and own property and to make contracts.

### Criminal Prosecutions

Plaintiffs contend that under authority of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), this Court should enjoin all state criminal prosecutions pending against plaintiffs. The evidence presented, they argue, satisfies the *Dombrowski* require-

ments for injunctive relief: (1) a bad faith use of a state's legal machinery with the purpose of inhibiting first amendment rights (or in the alternative, the existence of a state statute unconstitutional on its face affecting first amendment rights), and (2) a probability of irreparable injury, which is established if there is a significant chilling effect on first amendment rights that cannot be avoided by state court adjudication. Dombrowski v. Pfister, *supra* at 485–486, 489–490, 85 S.Ct. 1116; Sheridan v. Garrison, 415 F.2d 699, 709 (5 Cir. 1969).[41]

As to the first requirement, only one of the state statutes under which the criminal prosecutions were brought is unconstitutional on its face. Section 97(4a), Title 14, which requires muslims to register, violates the first amendment for reasons of vagueness and overbreadth. See pp. 440–444, *supra*. In addition, this section is not capable of an acceptable limiting construction in a single criminal prosecution to remove its constitutional infirmity. Dombrowski v. Pfister, *supra,* 380 U.S. at 490–491, 85 S.Ct. 1116.

The other statutes whose constitutionality is challenged, see pp. 444–445, *supra*, are not, on their face, subject to constitutional attack. However, we conclude that the state criminal prosecutions under these statutes, with one exception, should be enjoined. Here, state officials under the pretext of law

---

40. The state criminal prosecutions challenged by plaintiffs are: (a) Title 14, § 97(4a)—failure to register as a muslim—plaintiff Holmes; (b) Title 14, § 426—trespass after warning—plaintiff Holmes; (c) Title 10, §§ 21(93) and (94)—acting as agent of unregistered foreign corporation—plaintiffs Davis and Billingsley; (d) Title 3, § 95—permitting livestock to run at large—plaintiff Davis.

41. In *Dombrowski* plaintiffs alleged, and the Court spoke in terms of, infringement upon their first amendment right of freedom of expression. In two recent Fifth Circuit cases granting *Dombrowski*-type relief, the first amendment freedoms of speech and expression were at issue. Sheridan v. Garrison, *supra* (speech);

Machesky v. Bizzell, 414 F.2d 283 (5 Cir. 1969) (picketing). We are of the opinion, however, that *Dombrowski* relief also is applicable to other first amendment rights, for example, freedom of association and freedom of assembly. The above cases, although factually limited to freedom of speech and expression, often refer to the necessity for equitable relief when *first amendment rights* are infringed. Dombrowski v. Pfister, *supra*, 380 U.S. at 487, 494, 85 S.Ct. 1116; Cameron v. Johnson, 390 U.S. 611, 622–623, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) (Fortas, J., dissenting); Sheridan v. Garrison, *supra*, 415 F.2d at 705, 707, 708; Machesky v. Bizzell, *supra*, 414 F. 2d at 286–287, 289.

and order have employed local laws, valid on their face, to harass and punish plaintiffs for the exercise of their first amendment right of freedom of association, and their statutory rights under 42 U.S. C. §§ 1981 and 1982. *See* United States v. McLeod, 385 F.2d 734 (5 Cir. 1967); Sobol v. Perez, 289 F.Supp. 392 (E.D. La. 1968). The facts surrounding the pending criminal prosecution will now be examined to demonstrate the baseless nature of each charge.

After defendants Wyatt and Bishop discovered that Progressive Land Developers, Incorporated (PLD), a Black Muslim corporation, had purchased land in St. Clair County, they met with defendant District Attorney Waid for the purpose of ascertaining how the Black Muslims could be kept out of St. Clair County. Defendant Hodges, from the Attorney General's office, a native of St. Clair County, was appointed to assist Waid in his investigation. Waid or Hodges informed defendants Wyatt and Bishop of the criminal penalties and laws concerning acting as an agent for an unqualified foreign corporation and the muslim registration statute. Both Waid and Hodges disapproved of the Black Muslims owning land in St. Clair County.[42]

Thereafter, defendant Bishop swore out a warrant against plaintiff Billingsley, a Negro attorney, for acting as an agent for a foreign corporation not authorized to do business in Alabama, Sections 21(93)–(94), Title 10, Code of Alabama.[43] Billingsley allegedly violated the statute for engaging in one specific act: filing for record the deed for land purchased in St. Clair County by PLD. Billingsley did not draft or execute the deed but only filed it for record.[44] Although the state has a valid interest in requiring foreign corporations to register,[45] the mere ownership or leasing of land by a foreign corporation does not constitute doing business in the state. Friedlander Bros. v. Deal, 218 Ala. 245, 118 So. 508 (1928); *see* 36 Am.Jur.2d, Foreign Corporations § 340 (1968).

Defendant Wyatt swore out a warrant against plaintiff Davis for acting as an agent for a foreign corporation not authorized to do business in the state, §§ 21(93)–(94), Title 10, Code of Alabama. Davis, an employee of Ray Wyatt, performed various farming duties on the land sold to PLD. Davis was under the supervision of Ray Wyatt, was paid by Ray Wyatt Enterprises, believed that he was employed by Ray Wyatt Enterprises, and on numerous occasions charged gasoline purchases to Ray Wyatt Enterprises. On one such purchase, Davis attempted to charge a gasoline purchase to Ray Wyatt Enterprises but paid for the purchase with a personal check. Defendant Wyatt purchased the $5.00 check from the store owner and then used the check as the basis for an arrest warrant

42. At a public meeting organized by defendants Wyatt, Bishop and others, defendant Hodges told the audience that he represented the Attorney General of the State of Alabama, that his office would do everything in its power to aid the citizens of St. Clair County, and that he and the Attorney General were very much in sympathy with the problems resulting from the land purchase. Defendant Waid, who was in the audience, told individuals near him that several warrants had been sworn out against individuals connected with the farm and that his office was available to assist the citizens of St. Clair County in "any way they saw fit." Defendant Gallion, the State Attorney General, issued a press release on November 26, 1969, which stated that "the aims of the Muslim nation are similar in every respect to the aims of the communists * * *. [W]hile the Muslims appear on the surface to run legal businesses, they in fact engage in every type of subversive activity * * *. [T]he so-called farms can easily be used for storage of weapons and training in guerrilla warfare."

43. See note 25, *supra*.

44. The attorneys who drafted and executed the deed have not been charged with violating sections 21(93) or 21(94).

45. *See generally* NAACP v. Alabama *ex rel.* Flowers, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); Advance Industrial Security, Inc. v. William J. Burns International Detective Agency, Inc., 377 F.2d 236 (5 Cir. 1967).

against Davis for acting as an agent of PLD.

Defendant Golden claimed that he leased property near Pell City, Alabama, which was sold to PLD. Plaintiff Holmes moved farm equipment to the land allegedly leased by Golden and was informed by Golden to vacate his property. Holmes immediately left the land without moving the farm equipment but returned the next day with a companion to examine the equipment. However, when they returned, only Holmes' companion left the truck to examine the equipment. Golden several days later swore out a warrant charging Holmes with trespass after warning, § 426, Title 14, Code of Alabama.

▆▆▆ The above three arrests were baseless charges and were made for one purpose: to harass plaintiffs and those individuals connected with PLD and its farms with the hope of forcing them to leave St. Clair County. Our analysis of the factual circumstances surrounding each prosecution is not an attempt to determine the guilt or innocence of each plaintiff.[46] From this analysis, we conclude that plaintiffs' arrests and pending prosecutions were not undertaken as a legitimate exercise of the State's police power, but were instituted to harass or suppress their first amendment rights.

Therefore, in respect to plaintiffs' arrests and pending prosecutions under several state statutes, see note 40, *supra*, except for plaintiff Davis' prosecution under § 95, Title 3, which will be discussed below, plaintiffs have satisfied the first of the two requirements for injunctive relief. *See* Sheridan v. Garrison, *supra*, 415 F.2d at 709. The second requirement is "the probability of irreparable injury, which is established if there is a significant chilling effect" on first amendment rights that cannot be avoided by state court adjudication. *Id.* Here, it is clear that, though plaintiffs might ultimately prevail in successfully defending these prosecutions, the prosecutions themselves have a significant chilling effect on plaintiffs, and the class they represent, in the continued exercise of their first amendment rights.

▆▆▆ The remaining state prosecution challenged by plaintiffs—the arrest of plaintiff Davis for permitting livestock to run at large, § 95, Title 3, Code of Alabama—does not merit the requested relief. The evidence presented by plaintiffs does not disclose that the state criminal process was invoked "without any hope of ultimate success, but only to discourage" the assertion of first amendment rights.[47]

In summary, plaintiffs have presented sufficient evidence warranting injunctive relief from the state prosecutions for: (1) plaintiff Holmes—§ 97(4a), Title 14; (2) plaintiff Holmes—§ 426, Title 14; (3) plaintiffs Davis and Billingsley—§§ 21(93) & 21(94), Title 10.

### State Civil Action.

Defendants Palmer, Hare and Cash, as Trustees of the Pine Forest Missionary Baptist Church, brought a civil action in the Circuit Court of St. Clair County for trespass against the plaintiffs and others. The complaint seeks compensatory damages for the trespass and punitive damages in the amount of $250,000.00 for aggravating the trespass and $250,000.00 damages for denying and infringing upon the church's use of its land. Plaintiffs allege that the action has a "chilling effect" on their first amendment rights and request this Court to enjoin further proceedings pursuant to this action.[48]

▆▆▆ After *Dombrowski* it is clear that state criminal prosecution can be en-

---

46. *See* Cameron v. Johnson, 390 U.S. 611, 621, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

47. Dombrowski v. Pfister, *supra*, 380 U.S. at 490, 85 S.Ct. at 1123.

48. A defamation action seeking large punitive and compensatory damages and involving long and expensive trial proceedings can also have a chilling effect on first amendment rights. *See* Time, Inc. v. McLaney, 406 F.2d 565, 566 (5 Cir. 1969).

joined under 42 U.S.C. § 1983 where a challenged statute which infringes upon first amendment rights is unconstitutional on its face or where the statute is applied for purposes of discouraging protected activities. 380 U.S. at 489–490, 85 S.Ct. 1116. It is also clear that *Dombrowski* relief is not limited to state criminal prosecutions, but also is applicable to state civil actions. In Machesky v. Bizzell, 414 F.2d 283 (5 Cir. 1969), the Fifth Circuit found *Dombrowski* applicable to plaintiffs' challenge of a state court injunction which enjoined their picketing activities. The *Dombrowski* relief, however, was premised on the vagueness and overbreadth of the state court injunction which infringed upon plaintiffs' first amendment rights.

■■ Thus, although civil actions in a state court have a potential chilling effect on first amendment rights—and it seems clear that an action for trespass, seeking damages of $500,000.00 would have a chilling effect on plaintiffs' first amendment right of freedom of association—the *Dombrowski* elements must be present: a statute, or as in *Machesky* an injunction, challenged on its face as an unconstitutional abridgement of first amendment rights.[49] In this case these elements are not present; only the action itself is challenged as infringing upon plaintiffs' first amendment rights. Plaintiffs' defenses to the action, consti-

tutional or otherwise, must be raised in the state courts with right to appeal through the state courts and to the United States Supreme Court.

### Other Injunctive Relief.

■ Plaintiffs also request that all defendants should be enjoined from further conduct harassing, threatening and interfering with plaintiffs in the exercise of their first amendment rights under section 1983, 42 U.S.C., and certain property rights under sections 1981 and 1982, 42 U.S.C.[50] As citizens of the United States, plaintiffs have the right under sections 1981 and 1982 to make and enforce contracts and to own and hold property.[51] This right is enforceable against private individuals, without the requirement of state action, through both injunctive and monetary relief. See cases cited in note 51, *supra*. In addition, under section 1983, 42 U.S.C., plaintiffs can seek both monetary and equitable relief for the deprivation, under color of state statute, custom or usage, of their first amendment rights.

■ This Court's injunction of the pending state criminal prosecutions, in our opinion, is adequate protection of plaintiffs' first amendment and sections 1981–82 rights on plaintiffs' motion for preliminary injunction. An injunction prohibiting all future conduct harassing, threatening and interfering with plain-

---

49. The other *Dombrowski* element—bad faith enforcement—is inapplicable where the action was not pursuant to a state statute, etc. See 42 U.S.C. § 1983. Further, plaintiffs have not presented evidence that state officials participated in or were connected with the filing of the trespass action.

50. "§ 1981. *Equal rights under the law*
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

"§ 1982. *Property rights of citizens*
"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."
42 U.S.C.

51. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (§ 1982); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (§ 1982); Terry v. Elmwood Cemetery, 307 F.Supp. 369 (N.D.Ala.1969) (§ 1982); Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894 (E.D.Mo.1969) (§§ 1981, 1982).

tiffs in the exercise of these rights would be entirely too broad and possibly infringe upon defendants' constitutional rights. *See* Machesky v. Bizzell, 414 F. 2d 283 (5 Cir. 1969). However this Court will still have jurisdiction in this case, and can determine the necessity for further injunctive relief if specific conduct is brought to our attention.

■ Plaintiffs also request that we enjoin the Alabama Legislative Commission to Preserve the Peace from proceeding or acting in any manner pursuant to Alabama Joint House Resolution No. 5. Although we found that the Commission's authorization was unconstitutional on its face on grounds of vagueness and overbreadth, see pp. 445–449, *supra*, we have concluded that plaintiffs have not presented evidence that they will suffer irreparable injury if injunctive relief is not granted.[52] Here, unlike the factual situation in Dombrowski v. Pfister, *supra*, there is no contention that criminal prosecutions, pursuant to the challenged resolution, are threatened or pending against plaintiffs. Nor have plaintiffs presented sufficient proof that the mere existence of the resolution and thus the possibility that they will be investigated, creates a chilling effect upon the exercise of their first amendment rights.[53] Therefore, plaintiffs' request for injunctive relief is denied.

\*　\*　\*

The civil action against plaintiffs and others for trespass, the boundary dispute concerning the church's alleged easement to its cemetery, and the validity of defendant Golden's lease and option to purchase are issues which both plaintiffs and defendants have raised in this Court.

The resolution of these issues is to be determined in the state courts.

In granting declaratory and injunctive relief, we do not intend to "tie the hands" of local law enforcement officials or state courts. Federal courts will not interfere with state criminal prosecutions instituted pursuant to a valid state statute and not for the sole purpose of harassing and intimidating individuals in the lawful exercise of their first amendment rights.

52. Under Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), we have considered plaintiffs' request for a declaration that Resolution No. 5 is unconstitutional on its face independently from their request for injunctive relief against enforcement of the Resolution.

53. Liveright v. Joint Committee of General Assembly of Tennessee, 279 F.Supp. 205 (M.D.Tenn.1968), is not to the contrary. In *Liveright* the threat of irrepar-

able injury was clearly present. The plaintiffs were subject to compulsory process to appear before the committee and were subject to criminal sanctions if they did not comply with the committee's demand for information. In this case, plaintiffs have not demonstrated that the Legislative Commission to Preserve the Peace has the powers of compulsory process and criminal sanctions to enforce this power.